**NATURAL GAS DISTRIBUTING CORPORATION, Appellant,**

v.

**Murel WILLIAMS, Appellee.**

No. 3945.

Court of Civil Appeals of Texas. Waco.

Jan. 25, 1962.

Rehearing Denied Feb. 15, 1962.

Reeves & Reeves, Tyler, Jackson, Walker, Winstead, Cantwell & Miller, Jack Pew, Jr., Dallas, Wardlow Lane, Center, for appellant.

Bracewell, Reynolds & Patterson, Houston, Dudley Davis, Center, for appellee.

McDONALD, Chief Justice.

Plaintiff, Williams, instituted this suit as overriding royalty owner, against defendant, Natural Gas Distributing Corporation, alleging that he was entitled to additional money (to that already paid) as the net proceeds from certain gas production by defendant. Trial was to a jury and resulted in a judgment for plaintiff for $60,608.80.

Defendant is a producer of natural gas and operates a pipeline for distribution and sale of natural gas to users and purchasers.

Defendant, in 1953, was desirous of leasing 50 acres which belonged to plaintiff's father, (as well as additional acreage in the immediate vicinity). Plaintiff assisted defendant to procure such leases under oral agreement for an overriding royalty, and on May 2, 1953 defendant executed an assignment, in writing, to plaintiff, pertinent provisions of which follow:

"WHEREAS, C. Murel Williams caused said lease (the 50 acre lease) to be prepared and signed, procured an abstract covering same, and has rendered other services at considerable expense under an agreement with Lessee (Natural Gas Distributing Corp.) that he would receive ⅛ of ⅝'s overriding royalty interest in said lease, and in any and all other leases with which said 50 acre tract, more or less, covered by said lease should be at any time actually unitized or pooled by Natural Gas Distributing Corporation. * * *.

"On dry gas or casinghead gas, when marketed from said leases, the said C. Murel Williams shall be paid ⅛ of ⅝'s part of the *net proceeds at the well* derived therefrom, free and clear of all cost, other than production, severance, pipeline, sales and other direct taxes * * *.

"It is expressly agreed that operations, if any, on said premises, and the extent and duration thereof, as well as the preservation of the leaseholds, or either of them, by rental payments or otherwise, shall be solely at the will of Natural Gas Distributing Corporation * * *."

Thereafter defendant pooled plaintiff's parents' 50 acres with other acreage into a unit containing 575 acres (instead of the conventional 640 acres); in August 1953 defendant completed a gas well on the Williams 50 acres; and on 17 August, 1953 defendant entered into a contract with United Gas Pipe Line Company to sell the gas from the unit to United for 8.5 cents (later to be increased to 9.5 cents) per thousand cubic feet, and to deliver it to United at a point 1½ miles from the Williams well.

Defendant paid plaintiff his overriding ⅛ royalty on the basis of the price receiv-

ed from United, that is 8.5 cents and 9.5 cents per thousand cubic feet.

Defendant's gas pipeline runs past a connection with another well (the Love well) and thence some 50 miles where it furnishes gas for distribution at the towns of Teneha, Haslam, Joaquin and Garrison. Schematic diagram of such pipeline follows:

SCHEMATIC DIAGRAM

Defendant's main line which continues for 50 miles

To Love well

Meter to United

Meter Williams well

Plaintiff plead 2 separate but related causes of action. In his 1st cause of action he pleaded that some of the gas from the Williams unit was sold to purchasers in excess of the prices paid by United, and he sought an accounting for the gas sold. The gas from the Williams unit was put into the defendant's pipeline, and from August 1953 to 1 February, 1958 was commingled with gas from the Love well (also from the Childress well not shown in schematic diagram). Although United purchased an amount of gas equal to or in excess of the amount produced by the Williams unit (except for a few months' period) the gas by virtue of its physical characteristics commingled with the gas from the other wells; some of the gas from the other wells went into the amounts sold to United; and some of the gas from the Williams unit went into the amounts transmitted down defendant's pipeline for some 50 miles, and which was sold for varying amounts, the highest price during the period being 25 cents per thousand cubic feet.

The jury found that: 1) gas from the Williams unit went into defendant's main line;

2) Became so commingled with gas from other wells that it was impossible to determine who was the purchaser of each and every thousand cubic feet;

3) That defendant knew that such commingling of the Williams gas with gas from other wells was taking place;

4) That defendant intended to commingle such Williams gas with the gas produced from other wells;

5) That 25 cents per thousand feet was the highest price paid to defendant by purchasers of gas during the period.

Plaintiff contended for, and the Trial Court adopted the theory of the case, that since the defendant wrongfully commingled the gas on which plaintiff was entitled to an override of ⅛ of *"the net proceeds at the well"* that the net proceeds of the well were impossible of determination and plaintiff should have his override computed on

the basis of the well metered production, at the highest price paid, that is 25 cents. Defendant contended that since it contracted to sell the Williams well production to United for 8.5 and 9.5 cents that it was entitled to compute plaintiff's overriding royalty on this basis, and had done so. The trial court entered judgment for plaintiff on this phase of the case for $55,070.39.

Plaintiff's 2nd cause of action is to the effect that defendant orally agreed with plaintiff in consideration of his services to pool the Williams well in a *640* acre unit (which would have permitted greater production); and that in failing to do so, plaintiff was damaged in the amount of overriding royalty he received. The jury found that plaintiff and defendant made such an agreement in March, 1953, and that defendant had not carried out its agreement. The Trial Court calculated the increased production of a *640* acre unit as against a *575* acre unit and awarded plaintiff judgment on such increased production computed at 25 cents per thousand feet. This amounted to $5537.80 of the total judgment.

Defendant appeals on 37 points, presenting the following basic contentions:

1) The Trial Court erred in computing the net proceeds at the well on the basis of the highest price paid defendant by any purchaser of gas, because the assignment on which plaintiff bases his suit is on *"net proceeds at the well,"* which is not the highest price paid for any gas purchases.

2) The Trial Court rendered judgment on an erroneous theory that since defendant commingled gas from the Williams well with gas from other wells, and it was impossible to determine the ultimate purchaser of each and every thousand feet of gas produced from the Williams well, the measure of plaintiff's damage was the highest price paid by any purchaser.

3) The Trial Court erred in rendering judgment for plaintiff for $5537.80 damages because plaintiff's and defendant's oral agreement that the Williams unit would

contain 640 acres was inconsistent with and superseded by the written assignment of 2 May, 1953, (which gives defendant the right to determine the acreage to be pooled into the unit).

We revert to defendant's contentions 1 and 2. The Trial Court held that because defendant had commingled gas from the Williams unit with gas from other units, and because it was impossible to determine exactly who was the ultimate purchaser of each thousand feet of gas from the Williams unit, that defendant must pay plaintiff overriding royalty on the basis of the highest payment received for any gas, which was 25 cents per 1000 feet.

Defendant had a contract with United to buy at 8.5 and 9.5 cents, gas produced from the Williams well. While United purchased more gas than actually produced from the Williams well, (except for a period of a few months), it is undisputed that some of the Williams gas was commingled into defendant's main line with gas from other wells, and that gas from defendant's main line was sold for amounts up to 25 cents some 50 miles down the line. Defendant paid plaintiff his override based on the 8.5 and 9.5 cents paid by United, on *all* gas produced from the Williams well.

Plaintiff was entitled, under his assignment, to ⅛ of ⅞'s part of the *"net proceeds at the well"*. It is obvious that the highest price paid for any gas is not the "net proceeds at the well." The doctrine contended for by plaintiff and applied by the Trial Court has no application here. Defendant was not guilty of willful misconduct in commingling the gas, as was the producer in Mooers v. Richardson Pet. Co., 146 Tex. 174, 204 S.W.2d 606. (In our case plaintiff Williams received *some* royalty payment on *all* gas produced from the well, albeit computed on a basis he disagrees with. In the Mooers case, the royalty owner received *no* royalty payment computed on any basis, on the "hot oil" run from the well, in violation of the law). In fact the record here reflects that defendant was

relying on counsel and trying to pay plaintiff what he was entitled to, albeit that it may not have done so. Defendant would resolve this question by the amount United paid. The amount United paid would resolve the matter except for the fact that it is undisputed that for *"several months"*, United purchased less gas than was produced· by the Williams unit. The method defendant seeks to invoke to resolve the question of *"net proceeds at the well"* is not the complete answer; just as the highest price paid for gas by purchasers along the line is not the complete answer. We think the *"net proceeds at the well"* to which plaintiff was entitled is a question of fact for the jury to determine (on a month by month basis), from *all* of the facts and circumstances which might relate thereto. Moreover, we regard this phase of the case as not fully developed.

■ Plaintiff is entitled to ⅛ of the "net proceeds at the well". This means money. Defendant had the right to sell the gas to whosoever it chose, and absent fraud or bad faith in such sale, had only the obligation to plaintiff, to pay him ⅛ of the "net proceeds at the well." The commingling of the gas from the ·Williams well with gas from other wells could not prejudice plaintiff under the facts of this case, if United (to whom the gas was contracted to be sold by defendant in August 1953 upon completion of the Williams well), in any accounting month, purchased an amount equal to the total production of the Williams well. Therefore, as a practical matter, we think that if on future trial the proof should show without dispute that, for any accounting month, United purchased as much gas from defendant as the Williams well produced, and paid plaintiff an overriding royalty computed on the price United was paying under its contract, that such payment is conclusive on plaintiff, that he received that to which he was entitled. (Actually such computation does not take into account expenses for transmitting the gas the 1½ miles from William's well to the United meter point).

For the months that United did not purchase the entire production of the Williams well a different problem is presented, and what constitutes "net proceeds at the well" from all sales of gas during such period must be determined as a factual issue as noted above.

It follows that defendant's contentions 1 and 2 are sustained and this portion of the judgment relating to this phase of the case is reversed and remanded.

Defendant's 3rd contention related to the Trial Court's judgment for $5537.80 for damages because defendant breached his oral agreement with plaintiff to pool the ·Williams land into a unit containing 640 acres (instead of the 575 acres it actually contained).

The jury found that plaintiff and defendant made such an oral agreement on *23 March, 1953*. It is undisputed that defendant executed the written assignment made the basis of plaintiff's suit on *2 May 1953*. Such assignment provides plaintiff shall have an overriding royalty in the lease on .his parents' 50 acres and "in any and all leases with which such lease should at any time be actually unitized or pooled by Natural Gas Distributing Corporation. Such assignment then provides:

> "It is expressly agreed that operations on said premises, and the extent and duration thereof, as well as the preservation of the leaseholds, or either of them, by rental payments or otherwise, shall be solely at the will of Natural Gas Distributing Corporation * * *".

■ Guarantee Life Ins. Co. v. Davidson, Tex.Com.App., opinion adopted, *234 S.W. 883* states the parol evidence rule as follows:

> "A contract which has been reduced to writing, and imports on its face a complete expression of the whole agreement, without any uncertainty or ambiguity as to the object and extent

of the engagement, must be taken as expressing the final views of the parties, as well as the full consummation of their undertaking.

"In the absence of fraud, accident, or mistake, parol evidence is inadmissible to vary, alter, or add to the terms of a written contract, clear in its terms, unless upon its face it in some manner rebuts the presumption that it is complete. *This rule forbids the adding by parol where the writing is silent, as well as to vary where it speaks.*"

The effect of the parol evidence rule has more recently been stated by our Supreme Court in Hubacek v. Ennis State Bank, 159 Tex. 166, 317 S.W.2d 30, as follows:

"When parties have concluded a valid integrated agreement with respect to a particular subject matter, the rule precludes the enforcement of inconsistent prior or contemporaneous agreements."

See aslo Albers v. Schumacher Co., Tex. Civ.App., 314 S.W.2d 852 (N.W.H.).

The written assignment from defendant to plaintiff, of his overriding royalty, is not incomplete or ambiguous. Plaintiff does not even contend that it was. There is no issue of fraud, accident or mistake. We think plaintiff simply attempts to engraft upon the assignment a prior oral agreement.

The written assignment does not obligate defendant to construct a unit of any particular size. It simply recites that plaintiff shall receive an overriding royalty in "any" leases that should "actually" be placed by defendant in the unit.

The claimed prior oral agreement was not simply an agreement to place 640 acres in the Williams unit; it was an oral agreement to place 640 acres of leases in the unit and keep them there. Yet the assignment specifically provides that the "extent and duration" of operations on the premises "as well as the preservation of the leaseholds, or

either of them, by rental payments or otherwise, shall be solely at the will of Natural Gas Distributing Corporation." Thus defendant had the right under the assignment to release or abandon any of the·· leases which should at any time be actually unitized or pooled by it. Defendant was ˙not required to keep any particular amount of acreage in the unit, much less 640 acres.

█ We think any oral agreement·plaintiff and defendant had with reference to the inclusion of *640* acres in the Williams unit is "an addition to" and "inconsistent with" the written assignment which, under the authorities cited, must govern.

The contention is sustained and the portion of the judgment relating to this phase of the case is reversed and rendered that plaintiff take nothing.

Plaintiff's cross assignments have been considered and are overruled.

Reversed and rendered in part.

Reversed and remanded in part.